PROUTY v. MICHIGAN SOUTHERN AND NORTHERN INDIANA RAILROAD COMPANY, appellant.

*Corporations—Jurisdiction in action against foreign—preferred stock—right to dividends—Construction of contract—Practice—form of action—Interest—Evidence—laws of other States.*

Under Code, § 427, an action may be maintained in the supreme court by a resident of this State against a foreign corporation for any cause of action. *Howell* v. *C. & N. W. Railway Co.*, 51 Barb. 378, overruled.

Defendant, a railroad corporation, in 1857, issued certain preferred stock. By the terms of the certificates issued, it was stated that the stock was "entitled to dividends at the rate of ten per cent per annum, payable semi-annually, in New York, on the first days of June and December, in each year, out of the net earnings of said company, * * * and the payment of dividends as aforesaid is hereby guaranteed."

*Held*, (1) that the issue of stock of this character was authorized by the laws of Ohio, Michigan, Indiana, and Illinois under which said corporation was created and the stock was issued; and (2) that the holders of the stock were

entitled to the guaranteed amount of dividends out of the net earnings whenever made, and were not restricted to the earnings of any year for the payment of dividends falling due that year.

An action to secure the application of future earnings of defendant to the payment of dividends due on preferred stock was brought by one of the holders of such stock on his own behalf, and on behalf of others having like grounds of complaint; *held,* (1) that it was brought in proper form and (2) that the stockholders of defendant were not necessary parties.

The net earnings of the defendant before the action was brought had been, in part, appropriated to dividends upon common stock. *Held,* that the owners of preferred stock were entitled to interest on the dividends they were entitled to receive from the time of such appropriation.

The laws of other States affecting a matter at issue cannot be read for the first time on appeal. *Cutler* v. *Wright,* 22 N. Y. 472, 474, doubted.

APPEAL from a judgment against the defendants entered upon the report of a referee. The action was brought by John S. Prouty against the Michigan Southern and Northern Indiana Railroad Company, a corporation created and existing under the laws of the States of Michigan, Indiana, Ohio, and Illinois, and Jesse Hoyt and others, directors of such corporation, to secure the payment of dividends alleged to be due plaintiff as the holder of shares of stock in said corporation, known as "construction stock." The stock in question was issued in 1857, and the certificates representing it contained this provision.

"Guaranteed ten per cent stock. This is to certify that ——— entitled to ——— shares of one hundred dollars each in the guaranteed capital stock of the Michigan Southern and Northern Indiana Railroad Company denominated 'construction stock.' Said stock is entitled to dividends at the rate of ten per cent per annum, payable semi-annually, in New York, on the first days of June and December, in each year, out of the net earnings of said company, and is also entitled to share *pro rata* with the other stock of the company in any excess of earnings over ten per cent per annum; and the payment of dividends as aforesaid is hereby guaranteed. The said stock is transferable only on the books of the company, at their office in the city of New York, by the said stockholder in person, or by ——— attorney, on the surrender of this certificate."

Upon this stock no dividends were paid up to 1863, and it was claimed on behalf of the defendants that there were no net earnings realized during that period applicable to the payment thereof. Since that time dividends have been paid, and since 1864 dividends

have also been paid upon the common stock. Such other facts as are material to an understanding of the case appear in the opinion.

*Matthews & Foley*, for appellants. The court has no jurisdiction over the subject of this action, defendant being a foreign corporation. *Williston* v. *M. S. & N. I. R. R. Co.*, 13 Allen, 400; *Whitehead* v. *B. & L. H. Railway Co.*, 18 How. 218; *Howell* v. *C. & N. W. Railway Co.*, 51 Barb. 378; *Latimer* v. *Eddy*, 46 id. 61; *Karnes* v. *R. & G. V. R. R. Co.*, 4 Abb. N. S. 107. The stockholders should have been made parties. *F. C. R. R. Co.* v. *C. & T. R. R. Co.*, 13 Ohio St. 545. Plaintiff was not, on the merits, entitled to relief. He had no cause of action. 1 Redf. on Railw. 142; Lindley on Partn. 654; *Sturges* v. *E. U. Railway Co.*, 31 Eng. L. & E. 410, 411, 416. The directors of defendant were the sole judges of the sufficiency of the earnings for the purposes of dividends. *State* v. *Bank of Louisiana*, 6 La. 745; *Brown* v. *Monmouthshire Railway Co.*, 4 Eng. L. & E. 118; *Jackson* v. *Newark Plank R. Co.*, 31 N. J. Law, 277; *Rex* v. *Bank of England*, 2 B. & A. 620.

*Birdseye, Cloyd & Bayliss*, for respondent.

DANIELS, J. This action was brought by the plaintiff, a resident of the State of New York, on his own behalf and on behalf of others having like grounds of complaint, against the corporate defendant — a railway corporation organized and existing under the laws of the States of Ohio, Michigan and Indiana — to secure the payment of dividends agreed to be paid by such defendant upon certain shares of preferred and guaranteed stock issued by it in the year 1857. By the terms of the certificates issued, it was stated that the stock was " entitled to dividends at the rate of ten per cent per annum, payable semi-annually in New York, on the first days of June and December in each year, out of the net earnings of said company," and was " also entitled to share pro rata with the other stock of the company, in any excess of earnings over ten per cent per annum, and the payment of dividends as aforesaid," was thereby guaranteed.

The ten per cent dividends upon the stock were not paid from the time when it was issued until on or about the 1st day of July, 1863. And neither then nor at any time since was any payment made of the dividends in arrear. The object of this action was the

recovery of those arrears, and the judgment has provided for that by requiring the net earnings of the company to be applied to their payment.

It was urged upon the trial — and the objection was again taken on. the argument of this appeal — that the court had no jurisdiction over the cause of action presented by the complaint, because the railroad company was a corporation formed and existing under the laws of other States, and the other defendants proceeded. against were its directors. Numerous adjudged authorities were referred to in support of, as well as against the objection, most of which it will be unnecessary to consider; for neither of them when properly limited directly sustains or defeats it.

The jurisdiction of this court over actions against corporations created under the laws of other States and countries, has been defined and declared in very plain terms by statute; and it cannot be necessary to look very much beyond them in order to ascertain and determine the design of the legislature in its enactment. By that statute it has been provided — and the provision has been in force during the ·entire pendency of this action — that an action may be maintained in this and certain other courts, by a resident of this State, against a corporation created by or under the laws of any other State, government or country, for any cause of action. Code, § 429.

This is a broad and unqualified provision, containing nothing justifying the restriction placed upon it by the special term in deciding the case of *Howell* v. *Chicago & Northwestern Railway Co.*, 51 Barb. 378; and that must have been afterward the conviction of the learned judge who decided that case, for it was at a court held by himself that the order was made in this cause,· directing that judgment should be entered upon the report made by the referee. If that was not so, then this case is so far distinguishable in its facts from that, as to render the decision then made inapplicable to the objection now urged against the jurisdiction of the court. The case of *Whitehead* v. *Buffalo & Lake Huron R. R. Co.*, 18 How. 218, has no bearing upon the point presented, because the plaintiff in it was not a resident of this State, and his right to maintain his action depended upon the other provision contained in the section. The language used by the legislature is full and explicit; and, like all other statutes, should be construed according to the fair import of its terms, in order to carry into effect the object of its enactment;

and, as so construed, it includes the present action. *McClusky* v. *Cromwell*, 11 N. Y. 593, 601–2.

It is further objected, in support of the appeal taken from the judgment, that the stock upon which the dividends are claimed was issued without authority. The corporation issuing it was formed by the consolidation of two pre-existing corporations, operating a continuous line of railroad from Toledo, in the State of Ohio, to Chicago, in the State of Illinois, known as the Michigan Southern and the Northern Indiana railroad companies. Before the consolidation, by section 20 of an act of the legislature of the State of Indiana, approved May 11, 1852, it was provided that, "For the purpose of providing means for the payment of its debts, and for the construction of its road, materials or equipments, such company may issue a preferred stock, to an amount not exceeding one-half of the amount of its capital, with such priority over the remaining stock of such company in the payment of dividends as the directors of such company may determine and shall be approved by a majority of the stockholders." And this provision was applicable to the Northern Indiana Railroad Company, one of the constituents of the consolidation.

By another act, passed by the legislature of the State of Michigan, approved March 28, 1850, and applicable to the Michigan Southern Railroad Company, it was enacted by sections 3 and 4, that the company — for the purpose of providing means for the payment of its debts, and for the construction, extension and completion of its railroads, shops, depots, buildings and equipments — might "create and issue shares of guaranteed stock, to be denominated 'construction stock,' to such an amount *as it may determine*, not (with the original stock) to exceed the amount of their capital stock allowed by law, which construction stock shall be entitled to such dividends, and payable at such place, and in such manner, and with such preference over the remaining stock of said company in the payment of dividends, as the directors of said company may determine, and as shall be approved by the holders of a majority of the stock represented at their annual meeting."

Section 5 of an act passed by the legislature of the State of Ohio, approved March 3, 1851, conferred general and unrestricted authority on the Northern Indiana Railroad Company, created by its provisions, to consolidate with any railroad company then or afterward formed or incorporated in the States of Michigan or

Indiana, under any name mutually agreed upon, from which time it was to become a portion of such company. And by section 2 of an act of the legislature of Illinois, approved February 28, 1854, which was before the consolidation was effected, it was provided that any intersecting railroad companies having continuous lines should be authorized to consolidate their property and stock with each other, and by the name agreed upon should "be a body corporate and politic," with "all the powers, franchises and immunities which the said respective companies shall have by virtue of their respective charters before such consolidation."

The act of the legislature of the State of Indiana, approved February 23, 1853, allowing railroad companies of that State to "intersect, join and unite their railroad with any other railroad constructed or in process of construction" in that "or in any adjoining State, at such point on the State line, or at any other point mutually agreed upon," was equally as full and unrestricted; for it provided that it might be done, and the companies consolidated "upon such terms as may be by them mutually agreed upon in accordance with the laws of the adjoining State with whose road or roads connections are thus formed ; provided their charters authorize said railroad to go to the State line or to such point of intersection."

By section 50 of an act of the legislature of the State of Michigan, approved February 13, 1855, which was also before the consolidation, it was still further provided that any railroad company in that State having a continuous or connected line with any other railroad company, might consolidate with such company, either in or out of that State, into a single corporation. And that "such new corporation shall possess all the powers, rights and franchises conferred upon such two or more corporations, and shall be subject to all the restrictions, and perform all the duties imposed by the provisions of their respective charters or laws of organization" not inconsistent with the provisions of that act. And by another act, enacted and approved at the same time, by which the particular consolidation of the Michigan Southern and Northern Indiana Railroad Companies was explicitly authorized, it was provided that "all the franchises, property, powers and privileges," then "enjoyed by the Michigan Southern Railroad Company, and all the restrictions, liabilities and obligations imposed upon said two corporations by virtue of their respective charters, and all contracts by and with either or both of

said corporations shall appertain to said united corporation in the same manner as if the same had been contained in, or acquired under an original charter or made by or with said consolidated corporation."

Under and pursuant to these various provisions, an agreement was entered into by the different companies for their consolidation into one corporation, on the 25th of April, 1855, with the consent of their respective stockholders. And by the agreement then made it was provided and agreed that "all and singular their several and respective franchises, privileges and immunities" should henceforth "be the estates, property and effects, franchises, privileges and immunities of," the "consolidated company to all intents and purposes." And that it should "have all the powers, franchises, immunities, property and privileges" "enjoyed by the said parties of the first part, or the said parties of the second part," which included the constituent companies, "or which either of the said respective companies of the said first and second parts have, or had by virtue of their respective charters," before the execution of such agreement.

Under these statutory provisions, and the stipulations contained in the agreement made by the consolidating companies, there seems to be no room whatever for doubting the power of the new corporation to issue preferred and guaranteed stock, provided it was done with the consent of its stockholders, and it did not exceed the prescribed limits of the capital of the consolidated corporation. The power was fairly given to the constituent corporations, both by the laws of Indiana and Michigan ; for no essential difference can exist between preferred stock having priority over the remaining stock, in the payment of dividends and stock to which that preference may be guaranteed. In the one case the agreement to preserve the preference and pay the dividends before dividends may be paid on the common stock, is to be clearly implied, while in the other it is explicitly expressed. The obligation is substantially the same in each instance, and for that reason there was no practical difference, in this respect, in the authority conferred upon either corporation concerning the right to issue such stock.

The admitted as well as undenied allegations of the complaint show that the capital of the consolidated corporation was fixed at the sum of $12,000,000, of which $3,000,000 remained unissued when the preferred and guaranteed stock was provided for and

issued. This stock did not exceed that amount, and its issue was unanimously provided for and authorized by the stockholders, at their regular annual meeting in April, 1857, and by the action of the board of directors.

This action was made the subject of some criticism by the defendant's counsel, because it was taken to carry into effect the resolution adopted on the subject by the stockholders. But it is not justly subject to question; for, in any view which may be taken of it, the board did provide for and sanction the creation and sale of this stock precisely in the form in which it was offered to the company's stockholders. The latter were the only persons who could by any possibility be injuriously affected by it, because it postponed their right to dividends until the stipulated ten per cent should be paid out of the net earnings of the company on the new stock, under the guaranteed preference given to it. When they unanimously consented to relinquish their right to dividends until the stipulated ten per cent per annum should be paid upon the new stock, that would seem to be sufficient. to remove all objection to its validity, even if it had not been specially authorized by the statutes referred to and the agreement made for the consolidation, as long as the company at the time possessed the power to issue stock to the additional extent of $3,000,000. What its form should be, could only be important to the owners of the preceding stock; and when they waived their right to dividends in its favor, no ground for complaint could exist in favor of other persons, or of the corporation issuing the stock.

The provisions of the statutes requiring the dividends to be equally distributed among the stockholders of the company in no way affect the validity of the guaranteed stock. They were made to secure the observance of the ordinary rights of the stockholders; and it was contemplated that such rights might be surrendered by them in the provisions made for preferred and guaranteed stock, which were rendered dependent on the assent of a majority of the ordinary stockholders. Their rights were subject to this qualification, and they unanimously accepted it in favor of the stock afterward issued.

As no reason exists for doubting the validity of the preferred and guaranteed stock, it becomes necessary to consider whether the holders of it are entitled to their stipulated dividends out of the net earnings of the company for years succeeding those in which, by

the terms of the certificates, they were rendered payable. The circumstances existing at the time when the stock was provided for and issued, and which may properly be considered in its construction, warranted the expectation that the dividends rendered payable on the first days of June and December of each year by the terms of the certificates, could not be paid in the financial condition in which the company then was, for its floating debt was larger than the amount which could be realized from the sale of the preferred stock created for its payment, on the terms for which it was offered to the stockholders of the company. It was reasonably to be inferred, therefore, that there would not at once be any fund available for the payment of the stipulated preferred dividends, inasmuch as the earnings of the company would probably be all required for the payment of its floating and pressing indebtedness, so that it could hardly have been the design of the corporation, in issuing the certificates for the guaranteed stock, to limit their holders' right to dividends to the net earnings of the year in which it was agreed the stipulated distribution of them should be made.

The language used in the certificates embodies the same conclusion. For, while the ten per cent dividends are expressly made payable out of the net earnings of the company, it is also agreed by the guaranty following that the dividends shall be paid in that manner. The undertaking is explicit that the holders of the stock shall receive their annual ten per cent out of the company's net earnings. It was clearly designed that they should be assured, and have that amount for each year upon their investment; and as they could receive it only from the net earnings of the company — and it was certainly intended they should have ten per cent per annum, at least, upon the investment — if those earnings proved insufficient for the payment at the times mentioned in the certificates, it must have been designed that they should be afterward paid, whenever the net earnings of the company would permit that to be done. There could have been no other or different object for the positive stipulation that the holders of the stock should receive ten per cent per annum for their money. Although an investment in stock, it was substantially a loan to the company to relieve it from pressing necessities; and it could hardly have been induced, under the circumstances, on terms as favorable to the borrower, without the guaranty that all the net earnings were rendered liable for the payment of the annual dividends mentioned in the certificates; and

by that the company positively agreed that they should be so paid. Its apparent object was to render the ultimate payment uncontingent whenever the net earnings proved sufficient to enable the company to make it. That, though not in the express terms of the certificate, is its import and spirit, and it must have been so understood by the persons purchasing the stock. They had the right to assume that to be the character of the obligation created by it, and the company should be held to its performance in that way. In substance, it constituted a pledge of the future net earnings of the company for the payment of the yearly ten per cent dividends. That was its main expectation and purpose. It is true that, by its terms, it contemplated the creation of a sufficient fund to enable the company to pay during each year; but, if that expectation failed, nothing was inserted in the certificate discharging the company from all future obligation of payment when the fund should be sufficient to make it. The stipulations for payment and the guaranty that the dividends should be paid out of the net earnings, as stipulated, are consistent with the existence of no other design than that the holders of the preferred shares should receive their ten per cent per annum, in case the net earnings proved equal to that end. The holders were given an interest in the clear profits of the company, equal to the ten per cent which it was agreed they should receive from that source. The dividends mentioned are payable generally out of the net earnings of the company, and it would be doing more than it was agreed should be done, if the court should limit the right to payment to the earnings of any one particular year. The substantial obligation of the corporation was to pay ten per cent per annum on the stock out of the net earnings of the company, and the days on which the dividends were to be made were alone contingent upon its ability to make them. The failure, for want of net earnings, to make the dividends on those days did not exonerate the corporation from the general and paramount obligation to make them when the earnings necessary for that purpose should afterward be realized.

A somewhat similar point was presented for the construction of an act of parliament providing for preferred stock in the case of *Henry* v. *Great Northern Railway Co.*, 3 Jurist (N. S.),1133. There was no obligation to make payment of the stipulated dividends at any particular time in that case, beyond what might be inferred from the undertaking that they should constitute a particularly

specified sum per year. It could reasonably be inferred from that circumstance that the obligation at least existed to make the dividends annually; for that was the apparent purpose of the defendant, according to the form and import of the stock issued. But the court held that the stockholder was not deprived of his right to dividends, because the earnings out of which they were expected to be made were not realized during the year in which, by the terms of the stock issued, they ought to have been paid. On the contrary, the stock was held to be "a charge on all accruing profits, at the stipulated rates, before any thing is divided among the ordinary shareholders. This is, substantially, interest charged exclusively on profits." Id. 1137; 1 De Gex & Jones, 606, 637. A similar conclusion was maintained in *Taft* v. *Hartford, Providence & Fishkill R. R. Co.*, 8 R. I. 310, where the action failed because no net earnings had been received. See, also, *Crawford* v. *Northeastern Railway Co.*, 3 Jurist (N. S.), 1093; *Stevens* v. *South Devon Railway Co.*, 9 Hare, 313.

From these and other authorities, a recent text writer deduces the principle that "unless there is some agreement to the contrary, preference shareholders are entitled to be paid their dividends to the amount guaranteed, before the other shareholders receive any thing; so that if the profits divisible at a given time are not sufficient to pay the guaranteed dividends in full, the deficiency must be made good out of the next divisible profits, the ordinary shareholders taking nothing until all arrears of guaranteed dividends have been paid to the preference shareholders." 1 Lindley on Part. (2d ed.) 781. The principle is certainly warranted by the terms used in creating and selling stock, and it sustains what must have been, at the time, the reasonable expectations of both the parties. It is right and just, and ought to be maintained in the application made of it by the learned referee in the present case.

No reason exists for the objection that the plaintiff has deprived himself of his right to have the net earnings applied to the payment of the dividends claimed in this action, by his acquiescence in their distribution among the general stockholders; for it appears by his own evidence — and not contradicted by the defendants' witness, but found to be true by the referee — that the plaintiff protested against that disposition of the net earnings of the company, and demanded his dividends on his guaranteed stock. That, he stated, he was very particular to make each time.

When the action was commenced the corporation existed precisely the same as it had done from the time when the consolidation was effected, in the year 1855. It was alleged that a further consolidation was contemplated, but it did not appear to have been consummated, by any thing shown in the case, until after the referee had made his report. For that reason the proceedings up to that time cannot be deemed unwarranted by another consolidation, even if one actually took place before the report was in fact made. Up to that time no evidence of its existence was given in the action.

The action was professedly brought by the plaintiff on his own behalf, and on that of the other owners of the preferred and guaranteed stock having similar grounds of complaint. This was the proper form to be adopted under the circumstances constituting the cause of it. The case of *Williston* v. *Michigan Southern & Nothern Indiana R. R. Co.*, 13 Allen, 400, failed because an action at law could not be maintained ; and for the further reason that the courts of that State had no jurisdiction of an action against the defendant in the present form, because it was a foreign corporation. And the same conclusion was declared as to the impropriety of an action at law ·in *Chase* v. *Vanderbilt*, by the superior court. But that such an action as the present one was proper was conceded in the disposition which was made of Williston's case. The action referred to in the English courts was also brought in this form, and apparently assumed as free from objection in that respect. The same thing is maintained by Story's Eq. Pl. (7th ed.), §§ 94–103 ; also by *McKenzie* v. *L'Amereux*, 11 Barb. 516; *Bouton* v. *City of Brooklyn*, 15 id. 375 ; *Hammond* v. *Hudson River Iron & M. Co.*, 20 id. 378; *Cady* v. *Conger*, 19 N. Y. 256 ; and the relief awarded by the report is substantially the same as was decreed in *Henry* v. *Great Northern Railway Co.*, *supra*.

So far as the other owners of the guaranteed stock are concerned, the relief awarded precisely conforms to the settled practice of courts of equity. The rule in these courts is, "that the other creditors may come in under the decree and prove their debts before the master (now the referee), to whom the cause is referred," and obtain satisfaction of their demands equally with the plaintiff in the suit ; and under such circumstances they are treated as parties to the suit. Story's Eq. Pl., *supra*, § 99 ; *Hallett* v. *Hallett*, 2 Paige, 15, 19.

The decision made in *Kilbourne* v. *Allyn* (not reported), by the

general term of the third department, is not in conflict with this practice or the right in a proper case to maintain, such an action, for the facts did not bring the case within the law relating to this class of actions. And if they had, the disposition made of it was entirely improper, for the relief had been awarded to other persons without bringing them in under the judgment, and without any opportunity being afforded to them, or any desire being indicated by them, to become parties to the action, or to avail themselves of the benefit of the judgment recovered.

The objection that the stockholders should have been made parties to the action appears to be untenable. *Thompson* v. *Erie Railway Co.*, 45 N. Y. 468.

No good reason seems to exist for denying the plaintiff interest on the dividends he was entitled to receive from the time the net earnings were appropriated to the holders of the common stock by the corporation. The earnings should have been first appropriated to the dividends on the guaranteed stock. That would have given its holders the indemnity for the loss of which they are now to be compensated by interest, and they are entitled to interest for that purpose. *Adams* v. *Fort Plain Bank*, 36 N. Y. 255; *Dana* v. *Fiedler*, 12 id. 41.

The judgment authorized by the report will simply restrain the further misappropriation of the dividends to the common stock until the arrears, with interest on the guaranteed stock, shall be paid out of the net earnings of the company. And in that respect it will be as favorable to the defendants as they had any reason to require that it should be. Nothing less than what has been directed would provide the owners of the guaranteed stock with the relief they were entitled to have awarded.

The order made after the referee's report, substituting the Lake Shore and Michigan Southern Railway Company as the defendant, had no effect on the plaintiff's right to proceed with the action against the present defendants. For before judgment was entered, it was reversed upon appeal. And that as effectually removed it from the case as though it never had in fact been made.

After the reversal of that order, an application was made, upon the same and other papers, for leave to enter judgment upon the report of the referee, and to have a further reference to bring in other parties in interest. The order was made, allowing judgment to be entered and directing the reference applied for. From the

plantiiff's own papers, however, it was shown that the Michigan Southern and Northern Indiana Railroad Company had previously consolidated with the Lake Shore Railway Company and the Buffalo and Erie Railroad Company. This, it was stated and shown by the plaintiff, was done pursuant to provisions of the laws of the States of New York, Pennsylvania, Ohio, Michigan, Indiana and Illinois. But what those provisions were, was not in ·fact shown, beyond those contained in the law of this State, which, however, have no application to the obligations forming the plaintiff's cause of action in the present case. It must be assumed that the consolidations mentioned were lawfully effected, for that is stated to be the fact in the plaintiff's papers. And from them it appears that the preceding corporations have merged in and formed one single corporation, owning and operating a line of railroad from Buffalo to Chicago. By this merger the preceding corporations ceased to exist, according to the papers. now before the court on the appeal taken from the order, and all their property, franchises, rights and privileges have become vested in the new corporation formed by the final consolidation.

Although all the rights of creditors and liens upon the property of either of the corporations were, by the terms of the consolidations, preserved unimpaired, that gave the plaintiff no power to proceed against either of the constituent corporations, for he is not a creditor and had no lien upon the property of the corporation, within the meaning of these terms. They related to specific liens upon tangible property, and not mere equities, in the nature of charges upon earnings, like those existing in the plaintiff's favor. These were otherwise provided for by the stipulation that all just debts, guarantees, liabilities and obligations, existing against either corporation at the time of the consolidation, should be assumed, provided for, paid and discharged by the consolidated company; and that all contracts and agreements, between either of the companies and any person or persons, should be carried out by the new company.

The changes made appear to have been sanctioned by the votes of the requisite number of stockholders, and to have been entirely lawful and proper; and they necessarily ended the existence of the constituent corporations and the plaintiff's right to proceed to judgment against the one sued by him.

In order to avoid this result the statutes themselves have been referred to upon the present appeal from the order; but notwith-

standing the very general provision of the Code prescribing the proof of the laws of other States, they cannot be considered by the court, because they were not read on the hearing when the application for the order was made. If they provide for the continued existence of the old corporation for the purpose of securing satisfaction of the demands against it, they should have been read, or otherwise brought to the notice of the court, when that application was heard. They cannot for the first time be read upon the hearing of an appeal from the order which their provisions might have justified if they had there been made to appear. A different rule was suggested as proper in the case of *Cutler* v. *Wright*, 22 N. Y. 472, 474, but it was not afterward approved or followed. On the contrary, it was held in *Hunt* v. *Johnson*, 44 N. Y. 27, that the laws of other States could not for the first time be read upon the hearing of an appeal. They are required to be produced before the court entertaining the original application. The consequence is that no authority for proceeding in the case against the preceding corporation appears before the court. For that reason, as the corporation issuing the stock has ceased to exist, by merger in a new corporation, which has assumed all the obligations of its predecessors, the future proceedings should have been against the consolidated company. The order made on the application for leave to enter judgment, and for a reference under the judgment, was unauthorized, and it, as well as the judgment entered in pursuance of it, should be reversed, with costs. But, as the proofs made of the consolidation simply affected the plaintiff's right to the order itself, and the proceedings had under it, the preceding proceedings in the action cannot be effected or disturbed by such reversal. An order should also be entered denying the motion, but without prejudice to a renewal of it upon further papers showing the continuance of the corporation, if that can be done, for the purposes of the action.

LAWRENCE and DONOHUE, JJ., concurred.

*Ordered accordingly.*